## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | | |
|---|---|---|
| 4-R FARMS INC. on behalf of itself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY, BASF CORPORATION,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.: _____<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff 4-R Farms submits this Complaint on behalf of itself and those similarly situated for damages against Defendants Monsanto Company ("Monsanto") and BASF Corporation ("BASF"), and allege as follows:

## NATURE OF THE CASE

1.    This case involves the auxin herbicide dicamba, which is manufactured, sold, distributed, and promoted under the brand names Xtendimax and Engenia by Defendants Monsanto and BASF, respectively.

2.    Defendants misrepresented that their formulations of dicamba—Xtendimax and Engenia—could be used safely without causing harm to others through off target movement.

3.    Dicamba is a highly volatile herbicide that was discovered in 1958 by BASF, and marketed under various trade names including Banvel, Marksman, and Clarity.

4.    Due to its volatility, propensity to move off target, and ability to cause serious injury to non-target plants, dicamba was only used as a pre-planting or post-harvest burndown

herbicide prior to November 2016, and was not approved to be used for in-crop or over the top crop applications. To move off target means that the active ingredient in dicamba moves from its intended location to a location(s) where the crops are not genetically modified to be resistant to the active ingredients in dicamba.

5.     Since introduction of genetically modified seeds designed to be resistant to the active ingredient in Roundup in 1996, over-reliance on Monsanto's Roundup as a primary weed control herbicide created an environment in which Roundup resistant weeds flourished and proliferated across the United States.

6.     To retain its stranglehold on the seed and herbicide markets despite the decreasing efficacy of Roundup, and the impending loss of its patent protection for Roundup Ready seeds, Monsanto created new strains of soybean and cotton that were resistant to dicamba—an older, more toxic, and more uncontrollable herbicide. Monsanto branded these dicamba resistant crops as Xtend varieties.

7.     Monsanto thereafter collaborated with BASF to develop new formulations of dicamba that could be marketed for in-crop uses and over the top crop applications on Xtend soybeans and cotton.

8.     Defendants marketed these formulations as revolutionary breakthroughs that minimized volatility, and could be used safely without risk of causing harm to non-Xtend crops.

9.     In actuality, Xtendimax and Engenia are not appreciably less volatile than prior formulations of dicamba, and have caused serious harm to crops throughout the United States.

10.     Defendants sold these formulations of dicamba despite knowing that severe and widespread injuries would result, because Defendants understood that such injuries would force

farmers to defensively plant Xtend crops in future growing seasons and thereby increase the market for Xtendimax and Engenia, as well as Monsanto's Xtend soybeans and cotton seeds.

11.     As a result of Defendants' greed, recklessness, and callous disregard for the rights of American farmers, thousands of farmers' livelihoods have been jeopardized, and millions of acres of crops have been destroyed.

## PARTIES

12.     Plaintiff 4-R Farms Inc. is a corporation organized, and with its principal place of business, in Kansas that farms land on which it grows, among other things, soybeans, alfalfa, and corn in Nemaha and Pottawatomie County, Kansas.

13.     Monsanto is a corporation organized and existing under the laws of the State of Delaware with its corporate headquarters and principal place of business in St. Louis County, Missouri.

14.     Defendant BASF Corporation is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Morris County, New Jersey.

15.     Monsanto developed, licenses and sells soybean and cotton seed that have been genetically modified to be resistant to dicamba. Such seed was sold in Kansas for intended use with dicamba herbicide manufactured and sold by Monsanto, BASF, and other companies.

16.     In January 2009, Monsanto entered into a joint licensing agreement with BASF, the inventor of dicamba, to jointly develop and test new formulations of dicamba for use in dicamba resistant Xtend crops.

17.     BASF and Monsanto entered into an additional agreement in March 2011 in which the companies granted each other reciprocal licenses, and BASF agreed to supply formulated dicamba herbicide products to Monsanto.

18.    The dicamba formulations Xtendimax, which would be marketed and sold by Monsanto, and Engenia, which would be marketed and sold by BASF, were developed through and are manufactured pursuant to the agreements referenced above.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this District.

## DESIGNATION OF PLACE FOR TRIAL AND DEMAND FOR JURY

21.    Plaintiff designates Topeka, Kansas as the place for trial in this matter.

22.    Plaintiff demands a trial by jury.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

**A.    Monsanto, Glyphosate, and Super Weeds**

23.    Monsanto was one of the first companies to utilize biotechnology in the field of agriculture, and has become a leading producer of genetically modified seed and agro-chemicals.

24.    In the 1970s, Monsanto patented the glyphosate molecule, which became the main ingredient in Roundup herbicide. Roundup was introduced in 1974, and eventually became one of the world's most widely used herbicides.

25.    Monsanto also genetically engineered seed to withstand its glyphosate herbicide, sold under the brand name Roundup Ready.

26.    Rather than being applied before the crop is planted (in the "burn-down" stage), Roundup could be sprayed over the top of growing crops genetically modified to withstand it. Over-the-top application of glyphosate is now commonplace.

27.    Monsanto began selling Roundup Ready soybean seed in 1996 and Roundup Ready corn seed in 1998. Other crops genetically altered to withstand Roundup herbicide include canola, cotton, alfalfa, and sugar beets.

28.    The Roundup Ready crop system became Monsanto's flagship. Monsanto's Roundup herbicide and Roundup Ready seed each supported the other, becoming a blockbuster combination.

29.    By 2010, ninety percent of soybeans and at least seventy percent of corn and cotton were planted from Roundup Ready seeds.

30.    As of 2016, glyphosate had become the most-used agricultural chemical ever.

31.    Weeds, however, have developed resistance to glyphosate. These glyphosate-resistant weeds are known as "super weeds."

32.    Monsanto's sale and distribution of Roundup set in motion a dangerous cycle whereby weeds evolve to resist the chemicals designed to destroy them, forcing farmers to apply higher doses or use different herbicides.

33.    Monsanto's herbicide directly contributed to, this problem. All the while, Monsanto has made massive profits.

**B.    Monsanto Develops Dicamba-Resistant Cotton and Soybean Seeds**

34.    Recognizing the opportunity to capitalize on the weed resistance its own product produced, Monsanto developed a crop system featuring dicamba, an exceptionally volatile and damaging herbicide that has been on the market in various forms since the 1960s.

35.    According to Monsanto President, Brett Begemann, this new crop system will provide Monsanto "a source of growth longer term." Carey Gillam, *Monsanto to invest more than $1    bln    in    dicamba    herbicide    production*    (June    24,    2015),

https://www.reuterscom/article/monsanto-dicamba/monsanto-to-invest-more-than-1-bln-in-dicamba-herbicide-production-idUSL1NOZA1XN20150624.

36.     Dicamba is a broad-spectrum systemic herbicide that destroys broadleaf weeds and plants.

37.     Dicamba mimics the plant hormone auxin, causing uncontrolled cell division and growth, causing the plant to grow so fast that it cannot retain the nutrients it requires, which kills the plant.

38.     It is well known to agro-chemical companies like Monsanto that dicamba has extreme negative effects on desirable broad-leaf plants, including trees, fruits, vegetables, and various crops, especially soybeans.

39.     Certain plants are extremely sensitive to dicamba, even in trace amounts, including soybeans and cotton.

40.     A healthy soybean plant will produce fully-developed pods and leaves throughout the stem of the plant. A soybean plant damaged by dicamba suffers significant loss of pods throughout the stem, reduced number of beans per pod, and discoloration and cupping of the leaves of the plant.

41.     Dicamba also is highly volatile, meaning that it has a high propensity to vaporize after contact with target plants and then move as vapor through the air to other plants. Vaporized dicamba can travel great distances before falling onto and damaging desirable off-target plants, including non-resistant crops.

42.     For all these reasons, dicamba historically has been used in pre-planting or post-harvest burndown. Because there are typically no neighboring crops to damage during burndown, it is relatively safe to apply even highly volatile chemicals, such as dicamba, during this stage.

43.     Monsanto, however, wanted a dicamba herbicide that, unlike before, and similar to glyphosate, could be applied "in-crop," in other words, over the top of growing plants.

44.     In order to apply dicamba in this manner so as to kill unwanted weeds but not the crop, Monsanto, by at least 2008, had genetically engineered soybean and cotton seed for resistance not only to glyphosate but also dicamba.

45.     Monsanto genetically engineered soybean and cotton seed to withstand dicamba expressly for use with dicamba herbicide. There is no reason for, or value in, genetic modification to tolerate dicamba herbicide except for use of such herbicide.

46.     The cost of Monsanto's seed with the genetic modification for dicamba resistance is significantly more than seed without it.

47.     In addition to dicamba-resistant seed, Monsanto also developed what it represented to be a low-volatility dicamba herbicide that could be used with the seed "in-crop," that is, over the top of growing plants.

48.     Monsanto aggressively advertised and touted what became its Roundup Ready Xtend Crop System ("Xtend Crop System"), designed for and consisting of dicamba-resistant seed and dicamba herbicide.

49.     Monsanto has long considered — and marketed — dicamba-resistant seed and dicamba herbicide as an integrated system of weed control. Monsanto promotes its "Xtend Crop System" as "comprised of both seed and herbicide solutions." *The Next Step in Weed Management,* https://www.roundupreadyplus.com/Content/assets/docs/forum/NeedToKnow RoundupReadyXtendCropSystem.pdf (last visited Dec. 19, 2017).

50.     Monsanto not only promoted its own development of resistant-seed/dicamba-herbicide crop system, but actively and affirmatively encouraged, promoted, and collaborated with other companies to further it.

51.     Monsanto entered into agreements with BASF to collaborate in the development of such a system, consisting of dicamba-resistant seed to be supplied by Monsanto, and in-crop dicamba herbicide to be supplied by both Monsanto and BASF.

52.     In January 2009, Monsanto and BASF announced a joint-licensing agreement to accelerate use of dicamba-based weed control products, and to research and develop dicamba formulations to be used with dicamba-resistant seed.

53.     The companies conducted joint testing of dicamba formulations at Monsanto and BASF research locations.

54.     In a joint press release on November 2, 2010, Monsanto and BASF announced "significant progress toward launching next-generation dicamba-based weed control systems for soybeans and cotton." Joint Press Release, *BASF and Monsanto Announce Progress in Dicamba Formulations* (Nov. 2, 2010), https://monsanto.com/news-releases/basf-and-monsanto-announce-progress-in-dicamba-formulations/.

55.     Kerry Preete, Monsanto vice president of crop protection, stated: "Together the strength of the formulation expertise BASF has with dicamba and our team's biotech focus seeks to deliver another breakthrough product in weed control." *Id.*

56.     Markus Heldt, president of BASF's Crop Protection division, stated: "The dicamba tolerant system is designed [to] give growers pre- and post-emergence application flexibility, allowing them to better manage their resources and thus improving productivity." *Id.*

57.     In a joint press release on March 14, 2011, Monsanto and BASF stated that they had entered into an agreement to "collaborate on the advancement of dicamba tolerant cropping systems. The companies have granted reciprocal licenses and BASF has agreed to supply formulated dicamba herbicide products to Monsanto." Joint Press Release, *BASF and Monsanto Take Dicamba Tolerant Cropping System Collaboration to the Next Level* (March 14, 2011), https://monsantocom/news-releases/basf-and-monsanto-take-dicamba-tolerant-cropping-system-collaboration-to-the-next-level/.

58.     Robb Fraley, Monsanto's chief technology officer, stated: "Our work with BASF brings us one step closer to bringing more improved weed control offerings to farmers. We expect the formulations to be an excellent complement to Monsanto's dicamba tolerant seed technologies when they are brought to market." *Id.*

59.     Monsanto's development of seed genetically engineered to be resistant to dicamba meant that the new dicamba formulations would be sprayed over the top of crops after their emergence from the ground. In turn, this means that dicamba would be sprayed much later in the year than before — in months that are hot and humid — and in the vicinity of susceptible non-resistant crops also emerging.

60.     From the early stages of Monsanto's development of a crop system using dicamba, weed scientists and others warned of harm from large-scale dicamba use in summer months.

61.     On April 29, 2010, Monsanto applied with the Environmental Protection Agency (EPA) for registration of M-1691 Herbicide, a diglycolamine (DGA) salt of dicamba, supposedly less volatile than older formulations.

62.     In March 2011, the EPA expressed concern that "a potential increase in usage of dicamba products and the proposed changes in the timing of applications" could result in

widespread crop damage. The agency warned that "applications during a warmer time (i.e. post-emergence) may increase off-site transport (via volatility) during a time when many plants have leafed out. . . . Therefore, a post-emergence application may increase the likelihood of effects to non-target plants."

63.     On July 30, 2012, Monsanto applied for EPA registration of M-1768 Herbicide, also a DGA dicamba salt, this time with "VaporGrip® Technology," a technology that supposedly further lowered volatility, for use post-emergence, or over-the-top, of genetically-modified, dicamba-resistant soybeans and cotton.

64.     The USDA deregulated the soybean and cotton seed genetically engineered by Monsanto for resistance to dicamba on or about January 14, 2015, meaning that there would be no further regulation by that agency.

65.     At that point, however, there was no registration, from the EPA for any "low" volatility dicamba for use over the top of growing plants.

66.     Monsanto had a decision to make: wait to sell its dicamba-resistant seed until the EPA registered the supposed "low" volatility dicamba, or sell that seed without corresponding "low-volatility" dicamba herbicide approved for in-crop use. Monsanto chose profit and advancement of its own interests over the harm to others that inevitably would occur.

67.     Monsanto commercialized Bollgard II XtendFlex Cotton ("XtendFlex Cotton") for the 2015 growing season. Monsanto rolled out its new, XtendFlex Cotton for a "limited introduction" of 500,000 acres. It did so despite lack of approval for over-the-top dicamba.

68.     Because the EPA had not yet registered the supposed "low-volatility" version of dicamba herbicide, farmers were unable to buy corresponding dicamba herbicide approved for in-crop use on XtendFlex Cotton.

69.    Monsanto had been touting the supposed benefits of the Xtend Crop System for years, and aggressively promoted the new cotton seed.

70.    Monsanto's public stance was that dicamba herbicides were not to be used over-the-top. Monsanto representatives, however, advised farmers to do just the opposite — to spray existing dicamba products over the top of their crops in 2015.

71.    It otherwise was foreseeable that farmers would do so given that the very purpose for development of, and value in using, seed genetically modified for dicamba resistance is use of dicamba herbicide over the top.

72.    Monsanto knew or should have known that crop damage would occur as a direct result of its XtendFlex Cotton release in 2015.

73.    Farmers did experience dicamba damage to their crops in 2015.

74.    Again, Monsanto had a decision to make for the 2016 crop year. Again, it put its own financial interests ahead of safety and moved forward with commercialization of dicamba-resistant soybeans.

75.    Monsanto's financial incentive to ignore clear warnings was and is enormous.

76.    Monsanto's dicamba-resistant seed, the receiver for in-crop dicamba herbicide, is a new flagship and core business growth driver for Monsanto.

77.    As of 2015, Monsanto already had announced plans for the direct and licensed release of some 70 varieties of soybeans with the dicamba-resistant trait.

78.    Monsanto, also as of 2015, had already announced that it would invest some $1 billion in a production facility for its dicamba herbicide.

79.    In an interview, Monsanto's Vice President of Global Strategy, Scott Partridge, stated that Monsanto had bred the dicamba-resistant trait into its entire stock of soybeans and the

alternative to waiting would have been "to not sell a single soybean in the United States" that year. Emily Flitter, Special Report, *The decisions behind Monsanto's weed-killer crisis* (Nov. 9, 2017), https://uk.reuters.com/article/uk-monsanto-dicamba-specialreport/the-decisions-behind-monsantos-weed-killer-crisis-idUKKBN1D91Q9.

80.    Monsanto commercialized its genetically modified dicamba-resistant Roundup Ready 2 Xtend soybeans ("Xtend Soybeans") for the 2016 growing season.

81.    As with the 2015 release of XtendFlex Cotton, there was no dicamba herbicide approved for over-the-top use in 2016 when Monsanto commercialized its dicamba-resistant Xtend Soybeans.

82.    Nevertheless, and despite the prior year's damage from its XtendFlex Cotton, Monsanto proceeded with release of Xtend Soybeans for the 2016 growing season, telling farmers that approval of its new "low" volatility dicamba herbicide was "imminent." Monsanto Q1 2016 Results Earnings Call Transcript (Jan. 6, 2016), https://seekingalpha.com/article/3794576-monsanto-companys-mon-ceo-hugh-grant-q1-2016-results-earnings-call-transcript.

83.    EPA registration for the new herbicide, however, did not come until after harvest in 2016.

84.    Again, it was foreseeable that farmers would spray older dicamba formulations over the top of dicamba-resistant crops, and that the sale of dicamba-resistant soybean seed and continued sale of dicamba-resistant cotton seed in 2016 would lead to further dicamba damage to non-dicamba-resistant crops.

85.    Not only did damage result in 2016, it was on a much larger scale with both Monsanto's dicamba-resistant cotton and soybeans on the market.

86.     Monsanto and BASF were well aware of numerous reports of dicamba damage during the 2016 crop year.

87.     Monsanto's headlong drive to market was and is in reckless pursuit of gaining ever more market share through its new Xtend Crop System at the expense of innocent farmers.

88.     In fact, damage to off-target plants actually benefits Monsanto and BASF by pressuring farmers to purchase its dicamba-resistant seed as a protective measure to avoid damage from dicamba use by others.

89.     In addition to soybeans and cotton, Monsanto also has petitioned the USDA for deregulation of a genetically modified dicamba-resistant corn.

**C.     Introduction of Dicamba Herbicides for In-Crop Use**

90.     On November 9, 2016, Monsanto received a two-year conditional registration from the EPA for its in-crop dicamba herbicide, which Monsanto commercialized under the trade name XtendiMax with VaporGrip Technology ("XtendiMax").

91.     On December 20, 2016, BASF received a two-year conditional registration from the EPA for its in-crop dicamba herbicide with Monsanto's Xtend seed, which BASF commercialized under the trade name Engenia Herbicide ("Engenia").

92.     XtendiMax and Engenia are intended for application over the top of Monsanto's dicamba-resistant soybean and cotton.

93.     Both Monsanto and BASF advertised their new dicamba formulations as "low-volatility" herbicides that could be used safely and without fear of off-target movement.

94.     Monsanto and BASF, which provided the EPA only with their own volatility studies, refused independent volatility testing of XtendiMax or Engenia. Monsanto repeatedly denied university requests to research volatility of the herbicide. While Monsanto did provide

samples of XtendiMax to various universities, including the University of Missouri and the University of Arkansas, the samples came with contracts containing never-before-seen strict constraints which expressly prohibited volatility testing.

95.    Further, neither Monsanto nor BASF released evidence that their formulations of dicamba would not volatilize under the real-life conditions in which they were intended to be used.

96.    Among other things, according to publicly available EPA documents, Monsanto field tested its XtendiMax with "VaporGrip Technology" in only two locations — Texas and Georgia — involving specific soil types, only a few acres, and a limited time span. There was no modeling of large-scale spraying.

97.    Notwithstanding warnings from weed scientists, and the crop damage that occurred in 2015 and 2016, Monsanto rolled out its full brand-name line of Xtend products, including XtendiMax, XtendFlex Cotton and Xtend Soybeans for the 2017 crop season. BASF followed suit, introducing its Engenia for the 2017 crop season.

98.    Monsanto's much-touted "Xtend Crop System," entailing dicamba-tolerant seed and in-crop dicamba herbicide sold by Monsanto — as well as BASF — became fully available for 2017.

99.    Monsanto entered into agreements with the chemical company DuPont, allowing DuPont to utilize, market, and sell dicamba herbicide for in-crop use containing Monsanto's "VaporGrip Technology" under DuPont's trade name FeXapan.

100.    On or about February 16, 2017, DuPont received two-year conditional EPA registration for use of dicamba-based FeXapan with VaporGrip Technology with Monsanto's Xtend seed.

101.    All these companies did and do market the in-crop dicamba herbicide as part of a crop system using Monsanto's dicamba-resistant seed.

102.    Monsanto advertises and markets XtendiMax as a low-volatility dicamba formulation with "VaporGrip Technology," designed for use with dicamba-resistant seed sold and licensed only by Monsanto.

103.    Monsanto has described XtendiMax as "[a]n integral component of the Roundup Ready® Xtend Crop System." *Roundup Ready Xtend Crop System Chemistry,* http://www.roundupreadyxtend.com/About/Chemistry/Pages/default.aspx (last visited Dec. 19, 2017).

104.    BASF advertises and markets Engenia as a low-volatility dicamba formulation designed for use with dicamba-resistant seed, sold and licensed only by Monsanto, identified as "Dicamba-tolerant soybean sold under the trait name Roundup Ready 2 Xtend Soybeans." *Introducing the Most Flexible and Advanced Dicamba for Dicamba-Tolerant Crops,* http://agproducts.basflus/campaigns/engenia/assets/pdf/Engenia-Soybeans-National-TIB.pdf (last visited Dec. 19, 2017).

105.    Monsanto and DuPont issued a joint press release in July, 2016 announcing their multi-year dicamba supply agreement which Mike Frank, Monsanto vice president, said "represent[ed] continued commitment to the Roundup Ready® Xtend Crop System." Joint Press Release, *Monsanto and DuPont Sign Dicamba Supply Agreement* (July 7, 2016), http://www.dupont.com/corporate-functions/media-center/press-releases/monsanto-dupont-sign-dicamba-supply-agreement.html (last visited Dec. 19, 2017).

106.    DuPont advertises and markets FeXapan as a low-volatility dicamba formulation with "VaporGrip Technology" designed for use with dicamba-resistant seed, sold only by

Monsanto, calling FeXapan herbicide "part of the Roundup Ready 2 Xtend® Acre Solution." FeXapanTM Herbicide Plus Vaporgrip® Technology, http://www.dupont.com/products-and-services/crop-protection/soybean-protection/products/fexapan.html (last visited Dec. 19, 2017).

107.    In addition to its collaboration agreement with BASF, and its agreement with DuPont for use and sale of dicamba herbicide with the "VaporGrip Technology," Monsanto entered into technology licensing agreements with DuPont, "includ[ing] a multi-year, royalty-bearing license" allowing DuPont to market and sell soybean seed containing Monsanto's technology, including dicamba resistance. Joint Press Release, *DuPont and Monsanto Reach Technology Licensing Agreements on Next-Generation Soybean Technologies* (March 26, 2013) https://www.pioneer.com/home/site/about/news-media/news-releases/template.CONTENT/guid.EAB5E402-FECE-0123-144E-CBC62A6D8513.

108.    DuPont offered more than 30 varieties of soybean seed with Roundup Ready 2 Xtend® dicamba-resistant technology under its own Pioneer brand through its license with Monsanto.

109.    Monsanto and BASF promoted and represented their dicamba crop system as safe when it is not. For example, in a 2010 press release, Monsanto and BASF stated that they had made "significant progress toward launching next-generation dicamba-based weed control systems" and that the "new formulation work offers even further improvement in physical characteristics that result in better performance and safety to nearby crops." Joint Press Release, *BASF and Monsanto Announce Progress in Dicamba Formulations* (Nov. 2, 2010), https ://monsanto . com/news-releases/b asf-and-monsanto-announce-progress-in-dicamb a-formulations/.

110.    Even in 2017, Monsanto represented that its "VaporGrip" technology "significantly minimizes dicamba's volatility potential after spraying — provid[ing] growers and applicators confidence in on-target application of dicamba." *Significant Reduction in Volatility Potential,* https ://www.roundupreadyxtend. com/About/vaporgriptechnology/P ages/default. aspx (last visited Dec. 19, 2017).

111.    BASF informed retailers, distributors, consultants, purchasers and applicators that "the potential for dicamba volatility is low," and that "the Engenia herbicide formulation was developed to further minimize secondary loss due to volatization."

112.    BASF bragged that the volatility concerns about dicamba had been addressed, "so the herbicide remains in place." Engenia was advertised as 70% less volatile than Clarity, which itself was 70% less volatile than Banvel.

113.    XtendiMax, Engenia and FeXapan, however, still are volatile.

114.    Monsanto and BASF knew or should have known that there is no formulation that reduces volatility in dicamba to a level at which it does not volatilize and move from the target application. In fact, any formulation that would eliminate volatility would make the herbicide ineffective.

115.    Monsanto sold and/or licensed, and farmers planted, dicamba-resistant seed on approximately 25 million acres of soybean and cotton fields in 2017.

116.    Monsanto and BASF knew or should have known that commercialization of dicamba-resistant seed would result in increased use of dicamba herbicide, marketed for in-crop use during summer months when, among other things, conditions such as temperature inversions occur most frequently and non-target crops have emerged that will be at imminent risk.

117.    Temperature inversions exacerbate the risk of damage by volatilization.

118.    A temperature inversion occurs where the air above the ground is warmer than the ground itself. An inversion layer forms where the warmer air is present, blocking atmospheric flow. This causes the air over the inversion layer to become very stable, trapping everything inside of the layer.

119.    Temperature inversions can be difficult to predict and there are not a lot of reliable tools to detect an inversion event. Inversions also can occur after application of dicamba already has taken place.

120.    Even when sprayed properly, supposed "low" volatility, in-crop dicamba herbicides still can and do volatilize and become subject to movement in winds as low as 3 miles per hour.

121.    In addition, dicamba's volatility is long-lived, meaning longer exposure for non-tolerant plants and increased risk of movement. Field tests undertaken in 2017 showed that volatility of the dicamba formulations sold by Monsanto, BASF and DuPont occurred over at least a 2-3 day period after application.

122.    The number of acres that can be damaged by dicamba is directly related to the amount applied in an area.

**D.      Dicamba Damage in 2017**

123.    In 2017, there were thousands of complaints of dicamba damage. According to the EPA, over 3.6 million acres — about 4 percent of all soybeans planted in the United States — were damaged by dicamba in 2017 alone.

124.    The Kansas Department of Agriculture reported that it received complaints of dicamba damage from over 213 farmers in 2017.

125.    Nationally, more than 2,000 dicamba-related injury investigations have been or are being conducted with more than 3.6 million acres of soybeans demonstrating signs of dicamba damage.

126.    A leading weed scientist, Dr. Kevin Bradley from the University of Missouri has stated: "I've been doing this for more than 20 years now and I was around when Roundup Ready was introduced . . . In my opinion, this is nothing like the introduction of any trait or technology as far as the scope and the significance of the injury that's been observed across the U.S." He further stated: "I just don't think we know enough yet to apply [dicamba] safely." Eli Chen, *As harvest season begins, farmers worry how dicamba herbicide could affect next year's crop* (Sept. 19, 2017), http://news.stlpublicradioorg/post/harvest-season-begins-farmers-worry-how-dicamba-herbicide-could-affect-next-year-s-crop#stream/0.

127.    Symptomology of dicamba damage to a soybean plant, including upward leaf cupping, is unique to dicamba. Cupping throughout a field is a typical pattern indicating volatilization.

128.    Dr. Bradley explained that the pattern of damage in most fields and the symptomology suggests that volatilization is to blame: "The majority of fields I've been in are injured from one end to the other with no discernable difference in soybean symptomology . . . . This suggests problems with off-site movement through volatility." Michelle Cummings, *The Dicamba Dilemma,* Momentum, Fall 2017, at 13, https://view.joomag.com/momentum-fall-2017/0150973001508187562?page=13.

129.    Dr. Jason Norsworthy, Professor of Crop, Soil and Environmental Sciences for the University of Arkansas, told a task force of the Arkansas State Plant Board that he believed volatility was a "major cause of the issues" in 2017. Doug Rich, *Changes needed for dicamba*

*formulations* (Sept. 25, 2017), http://www.hpj.com/crops/changes-needed-for-dicamba-formulations/article61d062194796-5fbd-93e1-f789d923c541.html.

130.    Field experiments conducted by university researchers in the summer of 2017 also identified evaporating dicamba as the cause of the symptomology.

131.    Among other experiments, dicamba was sprayed into trays of soil at a remote location and then brought to and placed between rows of soybeans covered with plastic. The dicamba evaporated from the trays and caused damage to surrounding soybeans.

132.    Volatilization cannot be corrected with education.

133.    Dr. Rick Cartwright, a plant pathologist, University of Arkansas Extension administrator and Arkansas State Plant Board member, explained, "You apply [new dicamba formulations] to soybeans, and 36 hours later the product gets up and goes somewhere else. I don't know how you educate people to fix that." Greg D. Horstmeier, *Arkansas Sets Dicamba Limits* (Sept. 22, 2017), https://www.dtnpf.com/agriculture/web/ag/news/crops/article/2017/09/22/plant-board-limits-herbicide-use-2.

134.    Steve Smith, a former member of Monsanto's dicamba advisory committee, testified at a congressional hearing that "[t]he widespread use of dicamba is incompatible with Midwestern agriculture." Moreover, he concluded that "[e]ven the best, the most conscientious farmers cannot control where this weed killer will end up." Danny Hakim, *Monsanto's Weed Killer, Dicamba, Divides Farmers* (Sept. 21, 2017), https://www.nytimes.com/2017/09/21/business/monsanto-dicamba-weed-killer.html.

135.    Mr. Smith was removed from Monsanto's dicamba advisory committee due to what Monsanto characterized as a "conflict of interest." *Id.*

136.    Dr. Bradley has publicly expressed his opinion that all dicamba-based herbicides need to be kept "in the pre-plant, burndown, pre-emergence use pattern," and should not be used post-emergence. He explained that "the risk is too great for off-target movement to be spraying this for Palmer amaranth [pigweed] and waterhemp in soybeans." David Bennett, *What's the latest on dicamba drift in Missouri?* (Sept. 1, 2017), http://www.deltafarmpress.com/soybeans/what-s-latest-dicamba-drift-missouri.

137.    On August 2, 2017, Monsanto issued "An Open Letter to Our Fanner-Customers." Calling farmers the "heart and soul of our company," Monsanto stated that it was taking reports of crop injuries from dicamba "extremely seriously," and represented its "commit[ment] to supporting [farmers] at every stage of the season — every year." *An Open Letter to Our Farmer-Customers* (Aug. 2, 2017), https://monsanto.com/products/product-stewardship/articles/to-our-farmer-customers/. Monsanto represented to farmers with dicamba crop injury: "[W]e will stand by you throughout the growing season." *Id.*

138.    In October, 2017, the EPA announced that, by agreement with Monsanto, BASF and DuPont, it was re-classifying in-crop dicamba as a restricted use herbicide. Among other things, only certified applicators with special training, and those under their supervision, may purchase and apply in-crop dicamba during the 2018 growing season. Other changes include: additional record-keeping requirements; limiting applications to when maximum wind speeds are below 10 mph (from 15 mph); reducing the times during the day when applications can occur; and additional tank clean-out instruction.

139.    Such changes, however, do not reduce the inherent volatility of dicamba or address exposure through that volatility.

140. Notwithstanding the risk, and despite its pledges of responsibility, Monsanto plans to sell even more Xtend Soybeans in 2018, reportedly 40 million acres. This means that even more dicamba herbicides will be sprayed over the top in 2018 than in 2017.

141. Farmers are faced with a difficult choice — either buy more expensive genetically modified Xtend seed many do not want or run the risk that their crops will be damaged by dicamba.

142. Even this course is unavailable to farmers who grow crops for which there is no dicamba-tolerant seed.

143. The situation boils down to dicamba being an all-or-nothing technology. Either everyone plants dicamba-resistant seed and sprays dicamba or farmers choose the seed they want to plant and no one sprays dicamba. Monsanto's attempt to force everyone to use its Xtend Crop System is not reasonable or in the public interest.

144. Among other things, there are alternatives to glyphosate, including glufosinate (e.g. LibertyLink sold by Bayer) and other herbicides in development. While dicamba is effective against weeds, it is ruinous to non-resistant crops. Dicamba is highly dangerous not only to non-tolerant crops like soybeans and cotton, but fruits, vegetables, trees, and flowers that feed honeybees. Moreover, extensive use of dicamba is likely to produce the same tolerance as did extensive use of glyphosate.

## CASE SPECIFIC ALLEGATIONS

145. Plaintiff 4-R Farms Inc. grew soybeans and corn on approximately 1350 acres of farmland near Corning, Kansas.

146. In June and July 2017, Plaintiff observed significant dicamba injuries on Plaintiff's crops, including, but not limited to, cupping, curling, and discoloration of exposed plants, as well as some plant death. The damage was observed on approximately 220 acres of soybeans.

147.    Plaintiff grew soybean crops susceptible to and not genetically modified to be resistant to dicamba. As a result of the crop damage caused by dicamba, Plaintiff sustained a loss of yield in 2017.

148.    Injury to Plaintiff's non-resistant crops is a direct result of Monsanto and BASF's development, marketing and sale of a dicamba-based crop system featuring genetically-modified seed specifically developed and commercialized for the purpose of use with in-crop dicamba herbicide.

## CLASS ACTION ALLEGATIONS

149.    Plaintiff brings this class action pursuant to Rules 23(a), 23(b)(1), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all persons and entities in the State of Kansas who suffered damaged crops or plants due to dicamba drift or volatilization when dicamba was sprayed on Xtend products in 2017. Excluded from the class is the Court and its officers, employees, and relatives; Defendants and their subsidiaries, officers, directors, employees, contractors, and agents; and governmental entities. Also excluded are farmers who purchased or planted Xtend products.

150.    The proposed class meets the requirements of Rule 23(a) because the members of the class are so numerous that joinder of all its members is inapplicable. As reported by the Kansas Department of Agriculture, over 200 farmers reported that their crops were damaged in 2017.

151.    The commonality requirement of Rule 23(a)(2) is satisfied because there are questions of law and fact common to Plaintiff and the class. Among those common questions are:

      a.    Whether the members of the class have sustained or continue to sustain damages in their business or property by reason of Defendants' acts or omissions and, if so, the proper measure and appropriate formula to be applied in determining such damages;

b. Whether Defendants knew or should have known that their acts or omissions would cause or contribute to dicamba drift/volatization and damage to non-target plants and crops;

c. Whether Defendants are legally responsible for the damages caused to non-target plants and crops under one or more of the theories asserted in this Complaint;

d. Whether the members of the classes are entitled to compensatory, statutory, exemplary, and/or punitive damages.

152.    Plaintiff's claims are typical of the claims of all other members of the class because they arise from the same course of conduct by Defendants and are based on the same legal theories. Moreover, Plaintiff seeks the same forms of relief for themselves as they do on behalf of absent class members. Accordingly, Plaintiff has satisfied the typicality requirements of Rule 23(a)(3).

153.    Plaintiff has no conflicts with, or interests antagonistic to, absent class members. Plaintiff's commitment to the vigorous prosecution of this action is reflected in their retention of competent counsel experienced in litigation of this nature to represent them and the other members of the class. Plaintiff's counsel will fairly and adequately represent the interests of the proposed class and are adequate to serve as counsel in this matter. Accordingly, Plaintiff satisfies the adequacy of representation requirement of Rule 23(a)(4).

154.    This action meets the requirements of Rule 23(b)(3). In particular, there are questions of fact and law that predominate over any questions affecting only individual members, including, without limitation:

a. Whether dicamba is inherently and unavoidably dangerous when used over the top of growing plants during summer months when other non-dicamba resistant susceptible plants are also emergent.

b. Whether Monsanto and BASF carried on an abnormally dangerous activity, including:

    i. Whether selling seed genetically engineered for the express purpose of over-the-top dicamba application entails high degree of risk of harm to land or chattels of others;

    ii. Whether the likelihood of such harm is great;

    iii. Inability to eliminate the risk by exercise of reasonable care;

    iv. Whether the new use of dicamba is not a matter of common usage;

    v. The inappropriateness of such activity to the place carried on; and

    vi. Whether the value of such activity to the community is outweighed by its dangerous attributes;

c. Whether it was foreseeable to Monsanto and BASF that Plaintiff would be harmed by their sale of seed genetically modified for resistance to dicamba intended for use as part of a crop system involving application of dicamba over the top of growing plants in the vicinity of non-resistant susceptible crops;

d. Whether Monsanto and BASF owed a duty of care to Plaintiff;

e. Whether Monsanto and BASF's breach of duty caused harm to Plaintiff;

f. Whether Monsanto and BASF sold a product unreasonably dangerous when used in a manner reasonably anticipated and Plaintiff was harmed by such defective condition;

g.  Whether invasion of dicamba onto property possessed by Plaintiff constitutes a trespass and whether Monsanto and BASF aided and abetted a trespass;

h.  Whether Monsanto and BASF acted with complete indifference to or disregard for the rights of others.

155.    The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness and equity, to other available methods for the fair and efficient adjudication of this controversy.

156.    A class action is the appropriate method for the fair and efficient adjudication of this controversy. The presentation of separate actions by individual class members could create risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant and/or substantially impair or impede the ability of Class members to protect their interests.

157.    Maintenance of this action as a class action is a fair and efficient method for adjudication. It would be impracticable and undesirable for each member of the Class to bring a separate action. In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all members of the Class.

**CLAIMS FOR RELIEF**

**COUNT I — STRICT LIABILITY**
**ULTRAHAZARDOUS**

158.    Plaintiff incorporates by reference each and every paragraph set forth above as though fully alleged herein.

159.    Defendants' dicamba crop system, entailing dicamba-resistant seed and in-crop use of dicamba herbicide, has a high degree of risk of harm to others, specifically, farmers who grow susceptible non-dicamba resistant crops.

160.    The likelihood of serious harm to non-resistant crops from exposure to dicamba is great.

161.    The risk of harm cannot be eliminated with exercise of reasonable care.

162.    A crop system entailing application of dicamba over the top of growing plants is not a matter of common usage, but to the contrary, is new.

163.    Monsanto's promotion and sale of dicamba-resistant cotton and soybean seed in Kansas, expressly for use with dicamba herbicide to be sprayed over the top of growing plants was and is inappropriate given factors including foreseeably high usage of dicamba, as well as high levels of crops, including soybeans, particularly susceptible to off-target damage. Dicamba is so inherently dangerous to susceptible non-dicamba tolerant crops as to be unsafe and unusually dangerous for use in Kansas.

164.    The value of a dicamba-based crop system to the community is not outweighed by its dangerous attributes.

165.    Defendants' dicamba crop system is an ultrahazardous activity for which Defendants can and should be strictly liable.

166.    As a result of that activity, Plaintiff was harmed by damage to Plaintiff's crops from exposure to dicamba and loss of yield, which is the kind of harm the possibility of which makes the activity abnormally dangerous.

167.    Defendants' conduct in instituting and carrying out this ultrahazardous activity showed a complete indifference to or conscious disregard of the rights of others, including Plaintiff. Punitive damages are thus warranted.

## COUNT II — NEGLIGENCE

168.    Plaintiff incorporates by reference each and every paragraph set forth above as though fully alleged herein.

169.    Monsanto recognizes its role as self-professed innovator and promoter of herbicides and crops genetically modified to withstand them.

170.    Monsanto pledges that it "places the highest priority on the responsible development, manufacture and use of crop protection products." *Product Stewardship and The Pledge,* https://monsanto.com/products/product-stewardship/stewardship-pledge/ (last visited Dec. 19, 2017).

171.    Monsanto represents that it adheres to "the responsible development, management and use of technologies and products across our seeds, traits, and crop protection businesses through the entire product life cycle." *Product Stewardship,* https://monsanto.com/products/product-stewardship/ (last visited Dec. 19, 2017).

172.    According to Monsanto, "[s]tewardship is the shared responsibility of Monsanto and those who provide, handle and use our products . . . We want to ensure our products continue to be used properly. By following product life cycle stewardship processes, we stand behind our products from research and discovery to discontinuation and disposal." *Product Stewardship Safety,* https://monsanto.com/products/product-stewardship/product-stewardship-safety/ (last visited Dec. 19, 2017).

173.    Farmers are Monsanto's most immediate stakeholders. Those with non-resistant crops susceptible to dicamba are the most likely to be harmed by Monsanto's irresponsible conduct.

174.    Discussing farmers' concerns over the dicamba damage in 2017, Monsanto described farmers as "the lifeblood of our company and our first priority." Brian Naber, *Dicamba Field Investigations: What Monsanto Has Learned So Far* (July 21, 2017), https ://monsanto.com/products/articles/dicamba-field-investigations-monsanto-learned-far/.

175.    BASF, similarly, holds itself out as a responsible developer of chemical products.

176.    Monsanto and BASF knew that the commercialization, promotion, sale, and licensing of dicamba-resistant seed would result in significant use of dicamba herbicide over the top of growing plants. Monsanto developed such seed for this very purpose, and Monsanto and BASF jointly developed new dicamba formulations to further this purpose.

177.    Monsanto and BASF knew or should have known that even supposed "low-volatility" dicamba herbicide is still volatile, and still at high risk of moving off-target and damaging desirable non-resistant crops.

178.    The vast majority of damage in 2017 was attributable to volatility of dicamba, a function of chemistry and formulation rather than manner of application.

179.    To the extent damage was attributable to physical drift, Monsanto and BASF also knew or should have known that such drift was highly likely to occur.

180.    Physical drift, as opposed to volatilization, is movement of spray droplets to non-target areas.

181.    Dicamba not only is very volatile, but also very prone to physical drift.

182.    Such drift can be influenced by weather, wind speed and direction, droplet size and ground speed or spray pressure.

183.    Temperature inversions increase the likelihood of physical drift as well as movement upon volatilization.

184.    Monsanto and BASF knew or should have known that conditions in Missouri, including temperature inversions and a high level of crops susceptible to dicamba, created high risk of dicamba damage whether from volatilization or physical drift.

185.    Moreover, as described even by the EPA, the level of precaution necessary to prevent dicamba from moving off target is "extraordinary." Tom Polansek, *Monsanto, BASF weed killers strain U.S. states with damage complaints* (November 1, 2017), haps ://www.reuters.com/article/us-usa-pesticides-complaints/monsanto-basf-weed-killers-strain-u-s-states-with-damage-complaints-idUSKBN1D14NO.

186.    Label instructions were and are extraordinarily difficult if not impossible to follow. For example, the XtendiMax instructions entailed at least four sources: a container label with instructions for use, a supplemental label, an ever-changing website, and local state-by-state directions. Among other things, farmers were to spray only when winds were at least 3 miles per hour, but no more than 15 (now 10) miles per hour, significantly narrowing the window for timely application, particularly for farmers with many and/or geographically disbursed acres to spray. The label also stated that XtendiMax should not be sprayed during a temperature inversion, a phenomenon difficult to predict. It also must be sprayed no higher than 24 inches above the crops, using nozzles designed to produce coarse/ultra-coarse (larger) droplets. There are restrictions on the pattern of the spray and the pounds per square inch of pressure. Restrictions vary according to crop. The Engenia label is similarly complex and confusing.

187.    In addition, Monsanto and BASF knew, and were warned, that many of the user instructions are contrary to typical user practices. At an August 8, 2016 Arkansas Pesticide Committee meeting, Boyd Carey from Monsanto acknowledged that "there are things [in the

instructions] that are different than typical practices today." Arkansas Pesticide Committee Meeting (Aug. 8, 2016), https://monsanto.com/app/uploads/2017/11/Ex.-T.pdf.

188.    For example, course/ultra-course nozzles, producing larger droplet size, generally are understood by farmers as detrimental to coverage. The 24-inch boom height is lower that most farmers run their boom. Speed of the sprayer, while affecting spray pressure, also affects the number of acres that can be covered in a given time span. As one person attending an August 8, 2016 Arkansas Pesticide Committee Meeting said to Monsanto: "You're dealing with real people who have to fight the clock . . . We got guys with eight, 10,000 acres who have four planters, 30-foot long[,] 25 foot long because they have to plant it as quick as they can plant it because it's limited. They either lose their moisture or it turns to mud. That's what we're dealing with. We're not dealing with theory or drawing board things. That's why the problem with Dicamba is serious." Arkansas    Pesticide    Committee    Meeting    Minutes    (Aug.    8,    2016), https://monsanto.com/app/uploads/2017/11/Ex.-T.pdf.

189.    Dr. Bob Hartzler, Professor of Agronomy and Extension Weed Specialist for Iowa State University, commented that the restrictions in the XtendiMax label are "unlike anything that's ever been seen before." Tom Polansek & Karl Plume, *U.S. farmers confused by Monsanto weed killer's complex instructions* (Aug. 21, 2017), https://www.reuters.com/article/us-usa-pesticides-labels/u-s-farmers-confused-by-monsanto-weed-killers-complex-instructions-idUSKCN1B110K.

190.    Larry Steckel, a weed scientist in Tennessee, is quoted as saying that "it's almost impossible" to follow label directions for dicamba-based herbicides. Dan Nosowitz, *Farmers Say It's Nearly Impossible to Follow Monsanto's Dicamba Directions,* (Aug. 25, 2017)

https://modernfarmer.com/2017/08/farmers-say-nearly-impossible-follow-monsantos-dicamba-directions/.

191.    Not only did Monsanto and BASF recognize the difficulties in conditions and application, but they also recognized the need for rigorous education and training on the risks of dicamba sprayed over the top of growing plants and proper manner of application. At the August 8, 2018 Arkansas Pesticide Committee meeting, Duane Simpson from Monsanto acknowledged that application instructions were "going to take a lot of training, understanding, and respect to do this correctly." Arkansas Pesticide Committee Meeting Minutes (Aug. 8, 2016) https://monsanto.com/app/uploads/2017/11/Ex.-T.pdf. Sufficient effective education and training, however, were not provided.

192.    Moreover, Monsanto, which enters into agreements with those purchasing its seeds, could have made dicamba-specific application training a requirement of purchasing seed with the dicamba-resistant trait, but did not.

193.    Neither was any special certification required for application of the "VaporGrip" Xtend and FeXapan or Engenia herbicides.

194.    Monsanto and BASF knew or should have known that even conscientious applicators would have significant difficulty with the instructions and restrictions for in-crop dicamba.

195.    Even a very small amount of drift can result in extensive damage to susceptible non-resistant crops.

196.    It has been estimated that while one-eighth of a quart of glyphosate "will cause 20 percent damage to susceptible vegetation . . . you get 20 percent damage at one-fifteen-hundredth of a pint of dicamba." According to Steckel, "That's a game changing difference." Elton Robinson,

*New Herbicide Tech Demands New Nozzle Thinking — 10 Quick Points,* http ://agfaxweedsolutions. com/2017/01/12/new-herbi cide-tech-demands-new-nozzl e-thinking-10-quick-points/ (last visited Dec. 19, 2017).

197.    Monsanto and BASF knew or should have known that in-crop use of dicamba would result in dicamba damage to susceptible, non-resistant crops.

198.    Monsanto and BASF aggressively marketed a dicamba crop system knowing that dicamba could not be safely used in-crop and carries significant and serious risk to farmers growing crops not tolerant to dicamba.

199.    It was foreseeable to Monsanto and BASF, and highly probable, that injury to farmers growing susceptible non-resistant crops, such as Plaintiff, would occur.

200.    Monsanto and BASF had a duty of care to not create, or continue, an unreasonable risk of harm to Plaintiff.

201.    Because of the inherent and high risk of widespread harm associated with dicamba, Monsanto and BASF had a duty to exercise the highest degree of care in their commercialization of dicamba-resistant seed.

202.    At a minimum, however, Monsanto and BASF had a duty to exercise ordinary care to exercise precaution commensurate with the dangers to be reasonably anticipated under the circumstances.

203.    Rather than exercise even ordinary care, Monsanto and BASF did just the opposite, widely commercializing an inadequately tested and highly volatile herbicide that is seriously dangerous to susceptible non-resistant crops. Monsanto and BASF set about commercializing their dicamba formulations in a manner most likely to cause damage, including aggressive marketing, licensing, and unlimited release of a much-touted crop system into areas such as Kansas, resulting

in foreseeably heavy use of dicamba under circumstances including common occurrence of weather inversions, uncertified applicators, foreseeable difficulty of directions, lack of adequate education and training, and heavy planting of highly susceptible crops, creating a high probability of off-target movement and damage to non-resistant crops.

204.    Monsanto and BASF breached their duty of care.

205.    As a direct and proximate result, Plaintiff was damaged.

206.    Defendants' conduct showed a complete indifference to or conscious disregard of the rights of others, including Plaintiff. Punitive damages are thus warranted.

## COUNT III - STRICT LIABILITY
### DEFECTIVE DESIGN

207.    Plaintiff incorporates by reference each and every paragraph set forth above as though fully alleged herein.

208.    Monsanto, in the course of its business, developed, sold, licensed, and distributed soybean and cotton seed genetically modified for tolerance to dicamba specifically for use with dicamba sprayed over the top of growing plants.

209.    The seed was designed and sold by Monsanto as part of a crop system in which dicamba herbicide is sprayed over the top of growing plants in the same areas as non-resistant plants also emerging and highly susceptible to dicamba.

210.    When put to this reasonably anticipated use, the seed and crop system are unreasonably dangerous as dicamba volatilizes, and drifts, resulting in off-target movement and harm to susceptible non-resistant crops.

211.    The seed, as so designed and used, was in defective condition unreasonably dangerous at the time of sale. This is true even if dicamba application involved user error or misuse, which was objectively foreseeable.

212.    Moreover, Monsanto designed, marketed, affirmatively promoted and sold its dicamba-resistant seed for the purpose of use with in-crop dicamba herbicide as an integrated dicamba-based crop system unreasonably dangerous for the reasons herein described.

213.    BASF entered a joint venture along with Monsanto, whereby it would manufacture and market its own dicamba formulation, which it knew would be used with the defective seed system that Monsanto developed.

214.    As a direct result of the defective condition of the seed, as sold for post-emergence use of dicamba herbicide, Plaintiff was damaged.

## COUNT IV - TRESPASS

215.    Plaintiff incorporates by reference each and every paragraph set forth above as though fully alleged herein.

216.    Monsanto intentionally developed, promoted, marketed and sold genetically modified soybean and cotton seed for and with the express purpose of allowing and encouraging others to spray dicamba herbicide over the top of crops grown from that seed.

217.    Monsanto intentionally promoted and encouraged use of in-crop herbicide, including its own XtendiMax brand, FeXapan, sold under DuPont's brand name FeXapan, and Engenia, sold by BASF. Monsanto and BASF marketed, promoted, and encouraged use of dicamba over the top of growing plants as part of a "crop system" for use with Monsanto's dicamba-resistant seed.

218.    Monsanto intentionally sold genetically modified dicamba-resistant seed directly, and through agreements in which it has financial interest, into areas it knew were planted with non-resistant crops highly sensitive to dicamba and with knowledge not only that dicamba would be sprayed over the top of emerging resistant soybean and cotton as intended, but had and would

move off-target onto property without permission of rightful owners and possessors, including Plaintiff.

219.    Dicamba entered and was deposited upon property of which Plaintiff has possession and without Plaintiff's permission.

220.    Monsanto knew that such intrusion would, to a substantial degree of certainty, result from its acts.

221.    In addition, Monsanto promoted, aided, abetted, assisted, and contributed to the commission of a trespass.

222.    Such invasion interfered with Plaintiff's right of exclusive possession and caused substantial damage to their property.

223.    As a result, Plaintiff was damaged.

224.    Monsanto's conduct showed a complete indifference to or conscious disregard of the rights of others, including Plaintiff. Punitive damages are thus warranted.

Respectfully Submitted,

By: Gerald Lee Cross, Jr.

Gerald Lee Cross, Jr. (Kan. 23573)
Cross Law Firm, LLC
8000 Foster St.
Overland Park, KS 66204
Tel: (816) 454-5297
Fax: (913) 904-1650
lcross@gmolaw.com

James J. Bilsborrow (*pro hac vice* forthcoming)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Tel: (212) 558-5500
Fax: (212) 344-5461
jbilsborrow@weitzlux.com